# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### (MILWAUKEE DIVISION)

RANDLE RIVER HILLS LP,

     Plaintiff,

v.             Case No. _____

VILLAGE OF RIVER HILLS

     Defendant.

## COMPLAINT

  Plaintiff Randle River Hills LP, through its counsel, Kravit, Hovel & Krawczyk s.c., for its complaint against Defendant Village of River Hills alleges as follows:

### INTRODUCTION

  1.  This is a classic "not in my backyard case," in which Defendant Village of River Hills ("River Hills") is systematically excluding any apartments, renters, and homeowners who do not have a six-figure income or cannot afford a $700,000 five-acre estate in this closed community. River Hills jealously guards its affluent residents from anything that might affect what it calls the exclusive "character" of the community, but in so doing River Hills is violating both state and federal law.

  2.  __Smart Growth Law Violations.__ Wisconsin law requires that every community adopt a comprehensive plan pursuant to Wis. Stat. § 66.1001, sometimes referred to as Wisconsin's "Smart Growth" law, and to implement its land use policies and ordinances in a manner consistent with the mandated comprehensive plan. Section 66.1001(2) identifies nine elements that every community's comprehensive plan "shall" contain, including a "housing"

element requiring that the plan "provide a range of housing choices that meet the needs of persons of all income levels and of all age groups and persons with special needs" in addition to "policies and programs that promote the availability of land for the development or redevelopment of low-income and moderate-income housing . . . ."

3.     Beginning in the spring of 2009, River Hills commenced preparation of its first comprehensive plan to comply with the Smart Growth law (the "2009 Plan"). River Hills was given a $10,000 grant by the state to initiate the 2009 Plan. River Hills hired expert consultant Crispell-Snyder, Inc. ("Crispell") to develop and draft the comprehensive plan, to reflect River Hills vision of itself, *and* to be consistent with Wisconsin law. But when Crispell's draft terms and advice correctly stated that by law the River Hills 2009 Plan had to make accommodations for housing for all income levels, as well as for seniors and people with special needs, River Hills deleted all of those draft provisions. The 2009 Plan that River Hills then adopted directly violated the "housing" element of section 61.1001(2)(b).

4.     River Hills had another chance to fix this illegal deficiency when it issued an "updated" 2019 comprehensive plan ("2019 Plan" – together with the 2009 Plan, "Plans"). The 2019 Plan was approved and passed on October 16, 2019, Resolution 2019-31. Remarkably, the 2019 Plan, just like the 2009 Plan, wholly fails to make accommodations for housing for all income levels, or for seniors or persons with special needs, all in violation of the "housing" element of the Smart Growth law.

5.     **Fair Housing Act Violations.** River Hills has zoning and land use ordinances and policies that violate federal the Fair Housing Act, 42 U.S.C. § 3601 et. seq. ("FHA"). The purpose of the FHA is to end racially segregated housing in the United States. The protections provided by the FHA are not limited to cases of intentional discrimination, but rather

reach everything from unintentional disparate impact discrimination to policies that perpetuate segregation. River Hills housing ordinances and policies, which are maintained alongside its illegal Plans, allow *only* single-family residences on massive lot sizes, mostly five acres with some limited provisions for two and one acre lot sizes. The complete prohibition of apartments or any multi-family housing options disparately impacts African-Americans and other minorities, which is demonstrated by statistics comparing the racial composition of River Hills to surrounding communities like Milwaukee and Milwaukee County at large. The zoning ordinances and land-use policies of River Hills have no connection to a legitimate governmental interest in promoting the health, safety, morals, or general welfare of the community.

6. **Plaintiff Randle River Hills LP.** Plaintiff Randle River Hills LP ("RRH" or "Eder Farm") is aggrieved and injured by the River Hills violations of state and federal law. RRH is the owner of an approximately 55-acre plot of land located entirely within River Hills, approximately bordered by Brown Deer Road (Highway 100) on the south, Spruce Road to the east, and Greenbrook Drive to the north. The land has been in the Eder family for decades, and is known locally as the Eder Farm. Over the years, the land has been used for farmland, raising cows and pigs, and as a horse pasture. In the past two decades, River Hills has approved sale and use of several large parcels surrounding the Eder Farm for religious use, a church, a synagogue, and related school buildings and parking lots. Across Brown Deer Road facing the Eder Farm, River Hills approved the conversion of a private residence and grounds into an outdoor sculpture museum (The Lynden Sculpture Garden) open to the public, with visitor parking on site. Recently River Hills approved a liquor license for that site.

7. Beginning in or about 2014, RRH decided to sell or develop its Eder Farm holdings, to give the property its highest and best use. Many options were explored. RRH began

3

working with Mandel Group, one of southeast Wisconsin's most prominent and successful residential real estate developers, whose vision was to design and create a residential development in an area that lacked any multi-family housing, which would include apartments for empty nesters to transition from the large homes in River Hills and surrounding suburbs, and a certain number of housing units designed to address the needs of older adults and persons with special needs. The project was called "The Farm at River Hills" (hereinafter the "Project"). The Project required a zoning change and special use permit. RRH and its real estate developer went to work seeking a zoning change, because all of River Hills zoning is limited to single-family residences primarily sited on five-acre parcels, with small, limited areas where single-family residences are allowed on one-acre and two-acre parcels. No apartments of any kind are allowed in River Hills.

8.     The process of developing the proposal for official submission to the River Hills village board was extensive. The real estate developer conducted numerous meetings with village residents and individual board members in different settings, solicited feedback, and reshaped the proposal in various ways based on the feedback. This years-long process began in late 2014, and led to Mandel submitting an official proposal of the Project to the River Hills board in the spring of 2018. Among other things, the Project would have created a significant public open space for River Hills residents that would not have to be maintained by River Hills.

9.     From the time it was suggested, and throughout the proposed development and accompanying zoning change request, the Project was met with hostility and furious resistance from River Hills board members and residents. Despite several iterations incorporating many changes the developer made to reduce the building footprint and accommodate the objections of River Hills residents and village board members, the unreasonable hostility and

misguided criticism continued unabated. Due to this overt hostility, Mandel as RRH's real estate developer withdrew and abandoned the Project before River Hills took any formal action or voted on any aspect of the proposed Project. This caused RRH to lose $2,936,450, the option price Mandel contracted to pay RRH for the Eder Farm if River Hills approved the Project.

10.     In 2019, RRH obtained the rights from Mandel to use its plans and pursue the Project on its own, or with a new developer. On May 15, 2019, RRH formally proposed the Project and required zoning changes to the River Hills board of trustees. Without referring the matter to the River Hills plan commission (as required by law), or giving any other due process to the submission, the River Hills board of trustees, on the spot, rejected the Project by unanimous vote.

11.     After summarily denying the zoning change needed for the Project, River Hills continues its campaign to prevent any multi-family developments. RRH remains ready, willing, and able to commence development of a multi-family project on its property, whether in a form similar to the Project as recently rejected, or with some changes, which may include public housing, senior living, and/or rehabilitation, all uses consistent with and required by the Smart Growth law, and the FHA. The illegal, discriminatory conduct of River Hills, all in violation of Wisconsin and federal law, are the cause of, and the reason why, RRH has suffered damages and is unable to develop the Eder Farm to its highest and best use.

12.     The River Hills Plans and its zoning scheme violate the Smart Growth law by not making *any* accommodations for low-income housing (or even moderate-income housing), or housing for seniors or those with special needs. The Plans and River Hills zoning ordinances and housing polices also violate the FHA by creating a discriminatory disparate impact on racial minorities and by perpetuating segregation. The entire zoning scheme of River

5

Hills must be declared illegal and void, and RRH, as an aggrieved party, is entitled to damages, the right to develop the Eder Farm to its highest and best use, an injunction preventing River Hills from continuing to discriminate and violate the law, and other remedies, including punitive damages and attorney fees pursuant to 42 U.S.C. § 3613(c)(1).

## PARTIES

13. Plaintiff Randle River Hills LP ("RRH") is a limited partnership registered in the State of Wisconsin. RRH owns an approximately 55-acre parcel of land that is the subject of this dispute and which is entirely located within the Village of River Hills.

14. Defendant Village of River Hills ("River Hills") is a village located in Milwaukee County, Wisconsin.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. RRH asserts a claim as an aggrieved person under the FHA, 42 U.S.C § 3613, which "aris[es] under the Constitution, laws, or treaties of the United States."

16. This Court has supplemental jurisdiction over RRH's state law claims pursuant to 28 U.S.C. § 1367. The state law claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because River Hills is located within this judicial district and division, and a substantial part of the events and omissions giving rise to RRH's claims occurred here.

## BACKGROUND

18. RRH is a limited partnership owned and operated by its Eder family members.

19.     RRH owns an approximately 55-acre parcel located entirely in River Hills. The property is comprised of lots located at 1600, 1620, 1700, 1820 and 1980 West Brown Deer Road in River Hills, and is generally referred to as the "Eder Farm."

20.     As its name suggests, the Eder Farm currently is substantially used for farming. The property consists of mostly unimproved land, containing only two small rental houses, a horse barn, a wooden garage, and an older barn. Upon information and belief, the Eder Farm is the last, and only, undeveloped parcel in River Hills, and is the last, and only, parcel in River Hills used entirely for agricultural purposes.

21.     River Hills is a municipality located in the northeast corner of Milwaukee County, Wisconsin. It was founded in 1930 when wealthy members of the Milwaukee Country Club purchased large plots of land to ensure privacy from surrounding residences. River Hills currently covers an area of about 5.5 square miles and is home to approximately 1,600 residents.

22.     River Hills has strict zoning laws that prohibit any kind of commercial use and limit residential use almost exclusively to owner-occupied single-family homes on no less than 5-acre parcels. There are smaller, defined areas that allow single-family owner-occupied homes on two acres, and in three small areas, one acre. Apartments are not permitted.

23.     The River Hills website boasts that its "population density could well be one of the lowest among urban municipalities" and that the median price of the homes located within in River Hills is "approximately $700,000." The average household income in 2017 was $156,944.

24.     The website further describes the benefits of living in the "bucolic Village" while noting that it is "only nine miles, or fifteen minutes from the center of Milwaukee, a vibrant city with outstanding cultural venues, professional sports, and numerous

7

global corporate headquarters." River Hills openly brags that it can exploit the resources of Milwaukee and other surrounding communities, but keeps its own community walled off from any outsiders that would affect the "tranquility" and "security" of River Hills by its restrictive zoning.

## THE RIVER HILLS COMPREHENSIVE PLAN VIOLATES WISCONSIN LAW

25. In 1999, Wisconsin enacted what is referred to as "Smart Growth" legislation to ensure responsible planning, including a requirement that each community adopt a comprehensive plan and update that plan every 10 years.

26. Each community's comprehensive plan is intended as "a guide to the physical, social, and economic development of a local governmental unit." Wis. Stat. § 66.1001(1)(a).

27. Each comprehensive plan "shall" include nine separate elements that must be addressed, including (a) issues and opportunities element; (b) housing element; (c) transportation element; (d) utilities and community facilities element; (e) agricultural, natural and cultural resources element; (f) economic development element; (g) intergovernmental cooperation element; (h) land-use element; and (i) implemental element. Wis. Stat. § 61.1001(2).

28. The "housing element" in the law, stated in full, requires the following:

A compilation of objectives, policies, goals, maps and programs of the local governmental unit to provide an adequate housing supply that meets existing and forecasted housing demand in the local governmental unit. The element shall assess the age, structural, value and occupancy characteristics of the local governmental unit's housing stock. The element **shall** also identify specific policies and programs that promote the development of housing for residents of the local governmental unit and **provide a range of housing choices that meet the needs of persons of all income levels and of all age groups and persons with special needs**, policies and programs that **promote the availability of land for the development or redevelopment of low-income and moderate-income housing**, and policies and programs to maintain or rehabilitate the local governmental unit's existing housing stock.

Wis. Stat. § 66.1001(2)(b) (emphasis added).

29.     The relevant portion of § 66.1001(2)(b) excerpted above requires that a community's comprehensive plan *must* provide for housing for all income levels, age groups, and those with special needs.

30.     River Hills adopted the 2009 Plan on November 18, 2009. On October 16, 2019, Rivers Hills adopted the 2019 Plan.

31.     The Plans do not contain any kind of reference to, nor any prescribed programs or policies to accommodate people of all income levels, age groups, or people with special needs. Both Plans deliberately exclude what the Smart Growth law requires, and this exclusion is all the more glaring given that the "housing element" of the 2019 Plan expressly states that approximately one-third of River Hills households could have affordability challenges with their residences (applying HUD income standards). The Plans reflect River Hills policy to be only a large-home bedroom community, rejecting any zoning for housing opportunities for lower or middle income people, elderly, or persons with disabilities or special needs. And the 2019 Plan doubles-down on this policy. River Hills meeting minutes note that "it is not necessary to recommend any amendments or major changes to the Comprehensive Plan," and River Hills appears to have adopted the 2019 Plan as a mere formality.

### RIVER HILLS ONLY OPTION TO BRING ITS COMPREHENSIVE PLAN INTO COMPLIANCE WITH WIS. STAT. § 66.1001 IS TO PERMIT DEVELOPMENT ON THE EDER FARM

32.     River Hills completely and deliberately lacks diversity of housing options. The overwhelming majority of parcels located within River Hills are zoned single-family residential with a *minimum* lot requirement of five acres. Almost all of the remaining parcels are also zoned single-family residential, with minimum lot sizes of two or one acres.

9

33. These extravagant lot-size requirements do not in any way relate to the health, safety, and welfare of the community. The lot sizes are inherently suspect and reflect an intentional design to keep renters, as well as low, middle, and fixed income residents, out of the community.

34. Here is a graphic showing a surveyor's recent analysis of the zoning and land development potential of all the parcels in River Hills:



35.     As discussed above and as shown by this map, River Hills is almost exclusively zoned for large single-family lots that are *required* to be kept at massive acreages. Based on a survey analysis, approximately 85% of the land within River Hills is zoned R-1 Residential minimum five acres; 13% is zoned R-2 Residential minimum 2 acres; and 2% is zoned R-3 Residential minimum 1 acre.

36.     Even the extremely limited number of special "institutional uses" permitted in River Hills—such as for schools and houses of worship—require enormous lot sizes, fifteen contiguous acres or greater. Upon information and belief, no other community in Wisconsin has zoning that requires such enormous acreages for both residential and special uses.

37.     Based on the survey and expert analysis, the only parcel located within River Hills currently suitable for the type of development that would bring River Hills into compliance with Wisconsin's housing law is the Eder Farm.

38.     The Eder Farm is suitable for a higher-density development that could be designed to add a broader range of housing options to River Hills. No other similar undeveloped property exists in River Hills.

39.     The Eder Farm's suitability for such a development is demonstrated by the Project, which was first Mandel's, and is now RRH's proposal for developing an apartment complex on the Eder Farm. The Project proposal demonstrated that sewer, water, and other infrastructure could be built or extended to accommodate a higher-density development.

40.     The Eder Farm is the only undeveloped land suitable for River Hills to bring its housing options into compliance with Wisconsin law. River Hills is illegally refusing any type of development to keep its illegal zoning scheme in place.

11

## RIVER HILLS KNOWINGLY AND INTENTIONALLY FLOUTED HOUSING REQUIREMENTS UNDER WISCONSIN LAW

41.     Despite having the opportunity to remedy its housing availability problems as described above, Rivers Hills knowingly and intentionally has now twice deliberately decided to violate the housing requirements under Wisconsin law.

42.     In March 2009, the Wisconsin Department of Administration, Division of Intergovernmental Relations ("DOA"), awarded a grant of $10,000 to River Hills for the preparation of its first comprehensive Plan.

43.     River Hills intent to exclude all moderate- to low-income housing and any options for seniors under its Comprehensive Plan was declared early. In its 2009 Comprehensive Planning Grant Application Form, River Hills stated: "By virtue of its zoning, the Village of River Hills fulfills a certain niche within the housing market in the metropolitan area as a whole. Thus, affordable housing for all income levels can only be accomplished in conjunction with other communities." In other words, River Hills stated that its massive minimum lot sizes and zoning policies would dictate the contents of its comprehensive plan, and that the requirements of the Smart Growth law only apply to "other communities."

44.     In or about April or May 2009, River Hills contracted with third-party consultant Crispell to develop a Smart Growth Comprehensive Plan compliant with Wis. Stat. § 66.1001.

45.     During a May 18, 2009 meeting of the River Hills Plan Commission, Rebecca Houghtaling ("Houghtaling"), an urban planner for Crispell, discussed the requirements of Smart Growth planning and how the plan development process would work. Houghtaling stated that Crispell would develop the plan using their expertise and knowledge of state and DOA requirements, and send draft sections to the Plan Commission for review, comment, and

12

discussion at their next scheduled meeting. Crispell would then make revisions based on written comments, group discussions, and directives from River Hills staff.

46.     In a June 1, 2009 email, Houghtaling provided a draft plan Introduction, which stated that River Hills first plan was adopted in 1957 and has been the community's blueprint ever since. The 1957 plan had "strict zoning, allowing only for residential development and **restricting most commercial uses.**" (Emphasis added.) River Hills attorney, William Dineen ("Dineen") responded by email on June 10, 2009, stating that he had "entirely rewritten" Crispell's introduction. His rewritten version stated that River Hills "**probhits [sic]** commercial uses," but allows for certain special uses such as "places of worship, schools, private clubs, combination art/sculpture parks/museums, nature preserves" and wireless facilities on River Hills land. (Emphasis added.)[1]

47.     On June 3, 2009, Crispell sent River Hills its first draft of the "housing element" of the plan—which is required by section 66.1001(2)(b) as quoted above. Crispell emailed this section to Dineen along with others involved in developing the comprehensive plan, including board member Robert Brunner, board member and current president Steve Anderson, Thomas Tollaksen, Kelly Zylstra and other unidentified persons. The language addressing "Senior and Special Needs Housing" prepared by Crispell initially read as follows, and included a table depicting Special Needs Housing in the village and Milwaukee County:

---

**Senior and Special Needs Housing**

The Wisconsin Department of Health and Family Services (DHFS), Division of Supportive Living licenses a number of residential settings for the elderly along with facilities for the physically and developmentally disabled. Table 2-7 lists various residential settings and the total capacity in Milwaukee County and the number of such beds in the Village of River Hills.

---

[1] Two of the places of worship are adjacent to the Eder Farm, the church and synagogue noted herein. The "art/sculpture" exception is the Lynden Sculpture garden, a formerly private home allowed to be converted for this purpose. It is across the street from Eder Farm. It was recently granted a liquor license.

13

Table 2-7. Special Needs Housing in the Village of River Hills and Milwaukee County

| Facility Type | Description | Village of River Hills | Total Number Milwaukee County |
|---|---|---|---|
| Adult Family Homes (Licensed by the State) | A place where three or four adults receive care, treatment, or services above the level of room and board, including up to seven hours of nursing care. | 0 | 142 Facilities |
| Adult Day Care Center | A group day facility for adults who need assistance with activities of daily living, supervision or protection. | 0 | 27 Facilities |
| Community Based Residential Facility | A place where five or more unrelated people live together in a community setting. Services provided include room and board, supervision, support services and may include up to three hours of nursing care per week. | 0 | 258 Facilities |
| Facility for the Developmentally Disabled | A residential facility for three or more unrelated persons with developmental disabilities. | 0 | 72 Beds |
| Nursing Home | A residential facility for three or more unrelated persons that provides 24-hour services, including room and board and extensive nursing care. | 0 | 41 Facilities |
| Residential Care Apartment Complex | Independent apartment units in which the following services are provided: room and board, up to 28 hours per week of supportive care, personal care and nursing services. | 0 | 1,640 Apartments |

Source: Wisconsin Department of Health and Family Services, Division of Quality Assurance

48.    The table clearly illustrates the complete absence of special needs housing in River Hills. It reports zero beds for every category of facility listed, specifically, Adult Family Homes Licensed by the State – 0, Adult Day Care Center – 0, Community Based Residential Facility – 0, Facility for the Developmentally Disabled – 0, Nursing Homes – 0, and Residential Care Apartment Complex – 0.

49.    River Hills has no rental unit apartments by design, and upon information and belief is the only municipality in Milwaukee County that lacks apartments as a housing option. The complete lack of apartments, rental units, and multi-family buildings is antithetical to the concept of general welfare under the Smart Growth law.

50.    This lack of appropriate housing is the status quo that River Hills wanted to protect. Dineen then completed a comment form that asked to eliminate the Special Needs Housing section from the plan. Under Senior and Special Needs Housing, Dineen asked a

14

Crispell representative, "**Why does this need to be included? Table should be eliminated as well.**" (Emphasis added.)

51.     For each of the nine elements designated by Wis. Stat. § 66.1001, a comprehensive plan must state the Goals, Objectives, and Policies adopted by a community. Crispell's initial June 2, 2009 draft included the following instruction on policies that *must* be addressed with respect to Housing and Neighborhood Development:

> *[Note:  Policies must be identified regarding the following to meet state requirements:*
>
> - *Promote development of housing for residents of the local governmental unit and provide a range of housing choices that meet the needs of persons of all income levels and of all ages, groups, and persons with special needs.*
>
> - *Promote the availability of land for the development or redevelopment of low-income and moderate-income housing.*
>
> - *Maintain or rehabilitate the local governmental unit's housing stock.]*

52.     Dineen's request to remove the special needs housing section and chart from the draft plan was in direct contradiction to Crispell's instruction that this element should be "promote[d]" to meet state requirements.

53.     The Plan Commission met again on June 15, 2009.  Houghtaling and Kelly Zykstra, a Crispell engineer, attended to discuss the June 2nd draft.  During this meeting, Houghtaling commented that River Hills is very unique, observing that most communities are not basically 100% residential. Board member Mark Lloyd explained that River Hills did not provide special housing options: "I think the answer to many of the questions for housing is probably going to be that we have always relied on neighboring communities to provide these items."   Houghtaling explained that the State is "very specific on the things that must be covered in the plan," and that she included State of Wisconsin housing plans in order to comply with Wisconsin law.

15

54.     On August 10, 2009, the Plan Commission met again and discussed the next drafts of the plan. Crispell's introduction to River Hills Goals, Objectives & Policies section, dated July 29, 2009, explained that it was prepared "based on the municipal and community survey responses, Plan Commission discussions, *as well as statutory and DOA Smart Growth Grant requirements (indicated in blue type)*." To this draft, the planner added the following policy to meet statutory and/or DOA Smart Growth Grant requirements:

> Policy 3: Review and revise ordinances to allow for affordable quality housing for all residents, including seniors who wish to live in their home and persons requiring healthcare, custodial care, or supportive services.

55.     At the August 10 meeting, Dineen changed this language to state River Hills would only review (and not revise) its ordinances, and removed the references to seniors, custodial care and supportive services. Specifically, the re-drafted policy goal stated:

> Policy 3: Review the Village's zoning ordinances for consistency with the Comprehensive Plan. Review ordinances related to affordable housing for residents.

56.     Dineen's edits were incorporated into all subsequent drafts and very closely resemble what became River Hills housing policies under Objectives 1 and 2, respectively. From this point on, River Hills housing policies did not include any references to senior housing, care, or supportive services.

57.     Crispell's July 29 Comment Form for the Issues and Opportunities section describes River Hills as a "[l]ow-density, single-family residential community." It included a line under this heading to "[c]onsider housing for aging population." At the August 10, 2009 board meeting, President Robert Brunner instructed that that line be removed.

58.     The Issues and Opportunities section described River Hills as "rural estate living." Commissioner Robertson indicated he was not comfortable with this language and

16

directed that the word "estate" be removed throughout the document. Lloyd also directed that "estate" be removed from the Land Use section. Upon information and belief, removal of this language was likely done to avoid Fair Housing Act scrutiny.

59. The draft Land Use Overview discussed at the August 10, 2009 meeting read as follows:

> Land use is one of the most important factors in defining and shaping community character and livability. From its incorporation, the land in the Village of River Hills has been predominantly used for residential purposes with limited institutional uses scattered throughout the community. It is the intent of this plan to preserve River Hills established character and residents' quality of life by maintaining the long-standing limitations on non-residential uses within the Village and by recommending the location and quality of any future residential development.

In keeping with the Overview, the Future Non-Residential Land Use section stated that no additional land would be needed for commercial uses, no commercial land existed for such purpose, and no major changes in agricultural land were expected for the next twenty years. A draft policy said that development and redevelopment projects would be approved "only if the projects are consistent with goals of the comprehensive plan." This put into place River Hills plan for zoning to perennially be for nothing other than one-, two-, and five-acre single-family residential parcels.

60. In an August 26, 2009 memorandum to River Hills personnel, Houghtaling advised River Hills to submit a copy of Plan Draft No. 1 to the DOA for a thirty day review. This would allow time to incorporate any changes, additions, or modifications the DOA might require into Plan Draft No. 2 prior to public hearing. Houghtaling "strongly advised" River Hills to complete a DOA Comprehensive Plan Checklist, available on the DOA's website, to submit with the draft on items that "do not apply given River Hills unique residential character." She specifically advised them to address the required "housing element" for policies and

17

programs for persons with special needs and low to moderate-income housing. She stated these requirements explicitly:

> Part 3: Promote development of housing for residents of the local governmental unit and provide a range of housing choices that meet the needs of persons of all income levels and of all ages groups and persons with special needs.
>
> Part 3: Promote availability of land for the development or redevelopment of low-income and moderate-income housing.

61.     River Hills comprehensive plan did not promote either of these policies. That is what Houghtaling advised would require an explanation, at a minimum.

62.     Houghtaling drafted another memorandum to River Hills on September 8, 2009, regarding the completion of Draft No. 1 and plan development updates. "Drafts of the *nine required elements* were discussed during the Plan Commission's June, July and August monthly meetings. Based on comments by the Plan Commissioners, Crispell-Snyder, Inc. revised the draft elements and prepared Draft No. 1 of the comprehensive plan." (Emphasis added.)

63.     On September 15, 2009, the River Hills plan commission held a meeting to work on Plan Draft No. 2. Zylstra attended, and Dineen again instructed Crispell to remove the Senior and Special Needs Housing language. The meeting minutes describe Dineen's instruction: "Delete section under special and senior needs housing, as well as table 2.8. If you still wish to include the section change the wording to delete 'a number of' and add community based residential facilities are provided for under state law and River Hills ordinances."

64.     On October 9, 2009, Dineen edited his comments on Senior and Special Needs Housing in the September 15 meeting minutes. Upon information and belief, Dineen, having realized this section was required, instructed Barb Goeckner, River Hills Clerk/Treasurer, to make the following redlines:

18

~~Delete section under~~ Revise special and senior needs housing~~, as well as~~ and delete table 2.8. ~~If you still wish to include the section c~~Change the wording to delete 'a number of' and add 'community based residential facilities are provided for under state law and River Hills ordinances.'

65. Dineen's instruction to delete the table showing that River Hills had no senior or special needs housing facilities remained the same.

66. The Plan Commission met again on October 13, 2009 and discussed changes to Plan Draft No. 2, with Houghtaling and Zylstra participating. A resolution approving the plan incorporating those changes was executed. Houghtaling listed the changes in an October 14, 2009 memo to River Hills.

67. The River Hills board of trustees held a meeting and public hearing on adoption of the comprehensive plan on November 18, 2009. At this hearing, a resident asked if the "large vacant parcel in the area between Brown Deer and Greenbrook Roads" (referring to the Eder Farm) could be placed in a Wisconsin land trust or deemed a nature conservancy. This topic was not an agenda item, and Houghtaling explained that the comprehensive plan is a "broad brush stroke" and not written on a specific parcel level. Dineen said the land may only be used for single family residential purposes. Trustee Anderson added that this concern is consistently addressed throughout the plan, which maintains the rural nature of the community. Anything addressing that further "would take a lot of study."

68. The 2009 Plan was adopted by River Hills on November 18, 2009. It does not include policies that mention, much less "promote" or "provide," for senior or special needs housing, or low- to moderate-income housing. The 2009 Plan does not contain the tables prepared by Crispell in prior drafts showing there are no such senior and special needs housing facilities in River Hills, consistent with Dineen's instruction to Crispell to remove the table altogether.

19

69.     River Hills had a second chance to put in place a comprehensive plan that complies with the Smart Growth law. The Plan needs to be updated every 10 years. This time, River Hills knew, at the time it was considering updating the 2009 Plan in the summer of 2019, that it had already summarily rejected the RRH Project, which occurred at a board of trustees meeting May 15, 2019. This time, River Hills also knew that RRH had filed a Notice of Claim against the Village, on June 28, 2019, *based on the very Smart Growth law violations set forth in this Complaint*.

70.     The Smart Growth law is unambiguous, but even if there was confusion at its first implementation in the 2009 Plan, there was no ambiguity, and no room for rejection, of what the law required in formulating the River Hills 2019 Plan. The updated 2019 Plan again sets forth that "[o]ver 99 percent of the housing units . . . in the Village of River Hills are single-family homes," and "[t]here are no multi-family, manufactured, or other housing units within the village."

71.     The 2019 Plan doubles-down on the exclusionary zoning and land use policies adopted ten years earlier. In what might be considered "thumbing your nose" at the Smart Growth law, and RRH's Notice of Claim against River Hills then pending, the River Hills Plan Commission explicitly stated its finding, by resolution on September 23, 2019, that "it is not necessary to recommend any amendments or major changes to the Comprehensive Plan." And so, the 2019 Plan was unanimously passed by the River Hills Board of Trustees on October 16, 2019 and is presently in effect.

72.     The 2019 Plan makes no provision for affordable housing for low or moderate income citizens. As part of its discussion on the "housing" element, the 2019 Plan refers low and moderate income citizens to state-wide agencies, such as the WI Housing and

20

Economic Development Authority, who can hardly be of any assistance in River Hills, in which the median home price is $632,400 (as reported by River Hills), and which community deliberately has no smaller homes or rental property for low and moderate income citizens.

73.     River Hills has (twice) *knowingly* enacted Plans in violation of Wisconsin law to further its unlawful vision for the village—to exploit the resources of the surrounding communities while specifically and intentionally excluding housing for people that lack the wealth to live in their exclusive enclave, or who are elderly, or have special needs.

74.     River Hills deliberately put in place Plans, zoning, and policies to exclude the village from legal requirements to serve other than affluent single family homeowners. River Hills by the design of its Plans and ordinances is free to take advantage of the opportunities, amenities, and services provided by surrounding municipalities, but acts as if it has no obligation to reciprocate or to bear any burdens with respect to providing services for people of *all* backgrounds, such as affordable housing, apartments, or senior housing, as the law requires.

75.     Section 7.0103(B) of the River Hills zoning code states that "sufficient lands for industrial, manufacturing and mercantile purposes are now located in adjoining communities accessible to the residents of this Village in an amount sufficient for the needs of the entire community." Similarly, section 7.0804(D)(3)(a) of the River Hills Village Code, which sets forth the standards for consideration of applications for Special Uses, provides that the Village shall take into account "the number and location of uses of similar types and nature to that being proposed which already exist within the Village *or within neighboring municipalities*." (Emphasis added.)

76.     This is the exact approach River Hills took with respect to the housing element of its Plans—leave it to other communities to provide affordable housing and options for

seniors. It violates the Smart Growth law to pay lip service to the housing element requirements of Wis. Stat. § 66.1001, and leave the actual responsibility to provide those elements to other municipalities.

77.     The housing element of § 66.1001 is designed to prevent this kind of exclusionary zoning and housing scheme. If a single municipality is allowed to take the position that it need not provide a variety of, or affordable, housing options, then all municipalities may elect to take that position and there will be no affordable housing options available to residents of Wisconsin.

**RIVER HILLS ILLEGAL COMPREHENSIVE PLAN AND ZONING POLICES DISPARATELY IMPACT RACIAL MINORITIES AND PERPETUATE SEGREGATION**

78.     Governments have historically used zoning ordinances to intentionally discriminate against racial minorities. Overt and explicit effort at such intentional discrimination may be less today than in decades past, but discriminatory impact is still the reality of legacy zoning codes. The River Hills zoning code directly and indirectly perpetuates discrimination and segregation.

79.     River Hills code restrictions requiring enormous lot sizes with only single-family homes has precisely the discriminatory impact against racial minorities that continues to perpetuate segregation today. Recent statistical data from the Census' 2017 American Community Survey comparing River Hills to Milwaukee County and the City of Milwaukee confirms this:

|  | River Hills | Milwaukee County | City of Milwaukee |
|---|---|---|---|
| **Population estimate** | 1,558 | 956,586 | 599,086 |
| **White** | 81.0% | 60.6% | 45.8% |
| **White not Hispanic or Latino** | 79.7% | 52.2% | 35.8% |
| **Black or African American** | 6.7% | 26.4% | 38.9% |
| **Hispanic or Latino** | 2.2% | 14.6% | 18.4% |
| **Asian** | 7.7% | 4.1% | 4.0% |

80. The lingering effect of racism today is that African Americans and other racial minorities are disproportionately reliant on multi-family buildings for housing. *See MSP Real Estate, Inc. v. City of New Berlin*, Nos. 11-C-281, 11-C-608, 2011 WL 3047687 (E.D. Wis. July 22, 2011). River Hills by its Plans and ordinances has no apartments or allowed rental units whatsoever. River Hills complete ban of such housing options is a significant factor that leads to the de facto segregation and disparate impact discrimination shown in the statistics.

81. There is no legitimate governmental need for the enormous lot sizes required by River Hills because they do not promote the health, safety, morals, or the general welfare of the community. The purpose of these zoning requirements is purely exclusionary.

**RIVER HILLS RELIED ON ITS ILLEGAL COMPREHENSIVE PLAN
TO DENY DEVELOPMENT ON THE EDER FARM**

82. In December 2014, RRH and the Mandel Group entered into an agreement whereby RRH would sell Mandel Group the Eder Farm property, with the intention of using the land to create an agrarian-inspired eco-friendly multi-family residential development to be known as The Farm at River Hills ("Project"). The sale was contingent on River Hills approval

of the zoning change and issuance of a special use permit. In its initial forms, the Mandel Group proposal included a variety of housing options, including apartments, and senior-assisted living.

83. With the help of environmental experts, ecological experts, traffic experts, and demographic studies, among others, the Mandel Group put together a concept plan for the development. Because of River Hills strict zoning requirements, the Project plan required a Comprehensive Plan Amendment, Zoning Code Amendment, and a Special Use Permit.

84. From the start, despite the Mandel Group having met with numerous residents and individual board members, the Project was met with open hostility. The concept plans then went through numerous iterations, each time taking into account the feedback received from River Hills board members and the community. Many changes were made to the Project. The final Project plan reduced population density by **more than half**, and number of **units by two-thirds**. That final Project plan preserved more than 90% of the site for open space available for public use, and removed the senior-care element.

85. Even with the numerous and significant adjustments made to the concept Project plan, the River Hills community was openly hostile. A member of the River Hills board said the zoning changes would not be approved because they were inconsistent with its (illegal) comprehensive 2009 Plan. The actions of the River Hills board members and the village community caused the Mandel Group to abandon the Project, which in turn damaged RRH.

86. The opposition to the Project was based on the false premise that state law allows River Hills to exclude renters, low and moderate income, elderly and/or infirm persons, and the facilities that serve them. Those opposing the Project expressed that River Hills should never allow so many rental units because "renters are not homeowners" and so many new voters would out-vote "homeowner" residents.

87. Chris Lear, River Hills Manager/Clerk/Treasurer noted to one resident that "98% of the input we receive is negative." This is reflected in one resident's comment: "It is clear that the residents are vehemently opposed to rentals, and any sort of senior care."

88. Similarly, one resident complained that the Project would result in an "insignificant benefit to the tax base but a likely growth in public service needs"; predicted a "mass exodus from the immediate area causes a glut of vacant housing, lower property values and a reassessment of the Village's tax base"; and asked why does River Hills "want to house a transient population. . . . Again, we're also paying for public safety and a low crime rate that will be tough to maintain in a high-density transient development like The Farms." Another resident stated that those who rented were "temporary residents that would not have a commitment to the community." Someone else complained about "the influx of hundreds of renters (as opposed to homeowners)."

89. One resident complained that "[c]ommercial, apartments, traffic, traffic lights, litter etc. is not River Hills and hopefully we can keep it that way." Another called the proposed development "unimaginable" and bemoaned that the Project would detract from the "homes that show pride of ownership." Another complaint was more direct: "Why would our village accept a 'Deal' with no benefits and many significant negative? The status quo is outstanding and we don't have to change it."

90. When presented with "academic research" that home values would not be affected, one resident was incredulous: "[I]t is a farce to say home value will not be impacted [because] the average community studied (which arguably River Hills is in a peer group of almost no other community), the less applicable are the results of academic research. . . . Highlighting other nearby communities that are so dissimilar to River Hills . . . is insulting."

91.     One resident conceded that there was a need for the housing proposed by RRH and the Mandel Group, but ultimately resorted to not-in-my-backyard stubbornness: "While I concede that there may be a demand for this type of development and that it might be desirable by Mr. Mandel, his investors, and some current non-residents, I have yet to learn of any actual benefit to the current River Hills residents."

92.     More dramatically, one resident wrote that the proposed development "would singlehandedly destroy the character of the Village of River Hills" and vowed to "personally lead the recall effort of any trustee who thinks [t]his idea is good for the village." He finished: "it's time for pitchforks and torches."

93.     Sentiments such as those expressed above led to a fear-mongering and misinformation campaign to scuttle the Project. From the time the proposed Project became known, and intensified during the public comment time period, "Save River Hills" signs were distributed throughout River Hills, even in areas nowhere near the Eder Farm.

94.     One of the few residents who did not see the proposed development as a doomsday scenario observed that some of those in opposition were deliberately spreading misinformation about the proposed development: "I understand that the residents have a right to disagree, but I believe that the majority are doing so based on false pretenses. The majority of our neighbors who I spoke with actually believe that a big box store is coming to the village based on faulty fliers that were in our mail."

95.     This type of misinformation was dispersed in the "Save River Hills" campaign, complete with yard signs, a website, a listserv and many meetings where there were objections to any kind of development. Save River Hills warned that moving away from single-

family homes could have "unintended consequences" and "embark us on a slippery slope." What this coded language meant is obvious.

96.     Another of the few residents who vocally supported the project stated: "I'm well aware that the opposition to this development is extremely vocal and aggressive. For instance, a sign was placed in my yard without my permission, which to me is an unacceptable violation." This same resident stated the open hostility deterred him from speaking up at a meeting regarding the proposed development:

> Please know that I really wanted to speak up as an alternative voice for people's consideration the other night, but I honestly did not feel safe doing so considering . . . the opposition is so blinded in their stance, even loudly supporting comments by speakers that were incorrect and naïve, that putting any type of target on my back, or reason for people to give me and my family weird looks around town was not worth it. The fact that someone put a "Save River Hills" sign in my yard without my permission, also gave me pause about opening myself up to criticism.

97.     River Hills officials recognized that the opposition to the proposed development was getting out of hand. In reference to an upcoming meeting, Tammy LaBorde, the village manager, asked: "Should there be metal detectors? I don't think this is needed, but Barry [Mandel] told me he had a life threat at the Cardinal Stritch meeting. Perhaps USM has a policy on these and Chief Mrosak should be consulted."

98.     The opposition extended to River Hills personnel as well. Here is  Village President Steve Anderson plotting how to present opposition in an email to Tammy LaBorde, Dineen, and Azita Hamedani:

> How to present this? Bill, can/should I proceed not as president, but as a simple minded resident? Perhaps send it to the Trustees in early July, then share it with the SRH [Save River Hills] group and on their website. On July 18, after Barry [Mandel] makes his long presentation, can I rebut with this cogent message/analysis use slides, before public comments?

99.     In a separate email chain discussing a draft script for public comment on the Project, Tammy LaBorde revealed that River Hills was already prepared to reject the

27

development, even though the formal processes had not yet played out. In reference to the draft script, she stated: "The only concern I have is that the motion has already been crafted for the denial – you should not include that language with the general script for the meeting."

100.     The cross-pollination between River Hills officials and the Save River Hills organization was extensive. For example, an email from Azita Hamedani to River Hills village manager Tammy LaBorde and board member Steve Anderson stated: "An idea for Plan B . . . I think we should still 'keep' the meeting on the books . . . and instead use it as an opportunity for a member of 'saveriverHills to submit a friendly resolution that the village board 'affirms' the principles set forth by the founding of the village and the 2009 Commission for single-family residential homes." Anderson responded: "Azita, I really like your idea."

101.     This comment, addressing a potential benefit of the proposed Project, succinctly and directly sums up River Hills opposition: "THAT SEEMS VERY LOW FOR A VILLAGE TO PROSTITUTE THE FOUNDATION OF IT'S VERY SPECIAL AND UNIQUE CHARACTER."

102.     At the July 25, 2018 village board meeting, held at Cardinal Stritch University due to the size of the crowd, after hearing the outrageous, misguided opposition by River Hills board members and residents, Mandel withdrew the Project from further consideration.

### RIVER HILLS DENIED RRH PROCEDURAL DUE PROCESS WHEN IT REJECTED THE RENEWED PROPOSAL TO DEVELOP THE EDER FARM

103.     After the Mandel Group dropped out, RRH took over the Project proposal. On May 15, 2019, RRH officially submitted the Project to the River Hills board of trustees, including proposed amendments to the comprehensive plan and zoning scheme, with the intent of developing the Project itself or with another developer.

104.     The renewed Project proposal was identical to the Project submitted by Mandel except for the name on the proposal. At the May 15, 2019 meeting, the River Hills board of trustees considered the RRH Project for approximately twelve minutes, before voting unanimously to reject it.

105.     The River Hills board of trustees stated they did not need to see the details and did not need to hear additional comment.

106.     The board did not refer the Project proposal to the River Hills planning commission, nor schedule a public hearing as required by Wis. Stat. § 62.23(7)(d)(2). River Hills offered no substantive reason for the outright unanimous summary rejection.

107.     Upon information and belief, this procedure is not the process that River Hills normally follows for any proposed zoning amendment or proposal such as the Project.

108.     By its actions, River Hills denied RRH due process.

## CLAIMS FOR RELIEF

### COUNT I – Violation of the Smart Growth Law
### (Declaratory Judgment, Injunction, Damages)

109.     RRH incorporates by reference all allegations stated above as if fully incorporated herein.

110.     RRH has a right to develop the Eder Farm for the uses stated in the Project, and the uses required by Wis. Stat. § 66.1001, including but not limited to multi-family use, apartments for fixed or lower income residents, and/or for senior living/rehabilitation. River Hills has opposed this right by denying RRH the ability to develop due to its illegal 2009 and 2019 Plans. The Eder Farm is the only property in River Hills suitable for this kind of development and the statutorily mandated uses. A controversy therefore exists in which RRH has claimed a right against River Hills, who contests it.

29

111. The Plans violate Wisconsin law, and are void. River Hills claims that its Plans comply with Wisconsin law. RRH's and River Hills interests are adverse.

112. RRH has a legally protectable interest involved in this controversy, namely, its private property ownership, and its interest in using and/or developing its land to its highest and best use.

113. The issue involved in this controversy is ripe for judicial determination. RRH has completed all of the formal processes to seek a change to the zoning and Plans to allow the Project to be developed, but River Hills on May 15, 2019, by unanimous vote outright denied RRH's proposed changes. RRH filed its Notice of Claim against River Hills under Wis. Stat. § 893.80 on June 28, 2019. 120 days have expired without action by River Hills, which under Wisconsin law constitutes a denial by River Hills of RRH's claims.

114. RRH seeks a declaration that River Hills Plans violate Wisconsin law, rendering the 2009 and 2019 Plans void; that as a result, none of its zoning ordinances are valid or enforceable; and that RRH is free to develop the Eder Farm as it sees fit. The Court should further declare that River Hills restrictive zoning ordinance and policies concerning lot-size requirements, prohibiting apartments, and multi-family homes as unenforceable.

115. RRH is entitled to permanent injunctive relief, to prevent enforcement of River Hills zoning ordinances and invalidate the 2019 Plan, because they violate the Smart Growth law, the FHA, and cause discriminatory impact by keeping lower income, disabled, elderly, and minority persons out of River Hills.

116. RRH is also entitled to supplemental relief under Wis. Stat. § 806.04(8)—namely, damages.

30

117. The language used by the objectors, and endorsed by River Hills, included describing the potential residents of any Eder Farm proposed development as a "transient population," "temporary residents," and, derogatorily, "renters." River Hills viewed the Project or any other proposed development as "lowering property values"; providing an "insignificant benefit to the tax base"; creating "unintended consequences" and a "slippery slope"; potentially affecting River Hills "low crime rate"; and something that would "destroy the character" of River Hills and "prostitute the foundation of its very special and unique character."

118. The type of language and objections from River Hills to the Project makes it highly likely that any "lesser" proposal, such as a fully rent-controlled development or Section 42 housing, would be met with hysteria and rejected for the same improper and discriminatory reasons.

119. RRH has discussed with developers who specialize in Section 42 housing about using the Eder Farm as a potential site. At least one developer has stated that the significant opposition of River Hills would prevent such a development on the Eder Farm.

120. RRH has therefore been damaged by its inability to develop its property in *any* economically viable manner toward its highest and best use.

**COUNT II – Violation of the Fair Housing Act**
**(Damages, Punitive Damages, Injunction)**

121. RRH incorporates by reference all allegations stated above as if fully incorporated herein.

122. The Fair Housing Act prohibits housing discrimination "because of" race and other traits. *See* 42 U.S.C. §§ 3604-3606, 3617. Courts have interpreted the "because of" language to include claims of intentional discrimination, unintentional disparate impact, and perpetuation of segregation.

31

123. River Hills zoning ordinances, Plans, policies mandating enormous single-family residential lot sizes, and prohibition of multi-family residences or apartments cause, have caused, and will continue to cause (1) a disparate, discriminatory impact on African Americans and other racial minorities, and (2) a perpetuation of segregation.

124. There is no legitimate governmental reason—such as protection of health, safety, and general welfare—that necessitates these discriminatory policies.

125. River Hills discriminatory housing practices, including the summary rejection of the Project on the only property suitable for multi-family/apartment development in River Hills, has resulted in unlawful disparate impact discrimination and the perpetuation of segregation in violation of the FHA.

126. RRH is an aggrieved person under the FHA because it claims an injury due to River Hills discriminatory housing practices, namely, by its inability to develop multi-family housing, as evidenced by the rejection without proper consideration of the Project.

127. As an aggrieved party, RRH is entitled to actual damages, attorneys' fees, and an injunction preventing other and further discrimination by River Hills in violation of the FHA. *See* 42 U.S.C. § 3613(c)(1)-(2). Because the actions of River Hills in affirming its illegal 2009 Plan by approving the 2019 Plan with all of its known illegalities was intentional, and based on the aggravated, intentional facts set forth herein, RRH is entitled to punitive damages to prevent further illegal activity by River Hills, and deter other communities from similar misconduct, all consistent with the statutory purposes of the FHA. *See* 42 U.S.C. § 3613(c)(1).

## COUNT III – Violation of Procedural Due Process
## (Damages, Injunction)

128.    RRH incorporates by reference all allegations stated above as if fully incorporated herein.

129.    RRH submitted the Project for a zoning change, a change to the comprehensive Plan, and a special use permit.

130.    In submitting its proposal, RRH followed all the processes prescribed by River Hills for making such a proposal, including paying the appropriate fees.

131.    During the May 15, 2019 village board meeting, which was the first and only time River Hills formally considered the Project, River Hills by unanimous vote denied the changes and dismissed the proposal out of hand. River Hills followed none of its appropriate, statutory or customary processes, heard no public comment or debate, did not submit the Project for consideration by the River Hills plan commission, and held no public hearing.

The summary refusal by River Hills to consider, and its outright rejection of the Project, violated RRH's right to procedural due process under constitutional and common law of the state of Wisconsin, entitling RRH to relief. Based on the comments and actions of the individual board members of River Hills as described herein, River Hills violated RRH's due process rights by pre-judging RRH's proposal, therefore denying RRH a fair hearing and consideration of its proposal. *See Marris v. City of Cedarburg*, 176 Wis. 2d 14 (1993) ("If a Board member prejudges the facts or the application of the law, then [the] right to an impartial decision-maker is violated. . . . A clear statement suggesting that a decision has already been reached, or prejudged, should suffice to invalidate a decision.").

**WHEREFORE**, Plaintiff Randle River Hills LP demands judgment as follows:

1. A declaration that River Hills 2009 and 2019 Plans violate Wisconsin law, rendering them void.

2. A declaration that none of River Hills zoning ordinances are valid, and RRH is free to use or develop the Eder Farm as it sees fit.

3. A declaration that River Hills zoning ordinances and policies requiring large minimum lot sizes and prohibiting multi-family/apartment buildings are unreasonable and invalid.

4. Further supplemental relief determined to be necessary and proper under Wis. Stat. § 806.04(8).

5. Compensatory damages in the amount of $2,936,450, plus prejudgment interest, to compensate RRH for the injuries described herein.

6. Punitive damages, pursuant to 42 U.S.C. § 3613(c)(1), in an amount to be determined by the factfinder, to prevent further illegal activity by River Hills, and deter other communities from similar misconduct, all consistent with the statutory purposes of the FHA.

7. A permanent injunction, pursuant to 42 U.S.C. § 3613(c), enjoining River Hills from enforcing its illegal zoning and land use policies, or from interfering with RRH developing its property as it sees fit. A permanent injunction is necessary to give effect to the Court's rulings and guide the conduct of River Hills going forward

8. An award of fees and costs that are equitable and just under Wis. Stat. § 806.04(10) and/or 42 U.S.C. § 3613(c).

9. Such other and further relief as the Court deems just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated: November 7, 2019.                    Respectfully submitted,


                                            */s/ Stephen E. Kravit*
                                            Stephen E. Kravit
                                            Leila N. Sahar
                                            Stuart J. Check
                                            *Attorneys for Plaintiff Randle River Hills LP*
                                            Kravit, Hovel & Krawczyk s.c.
                                            825 North Jefferson - Fifth Floor
                                            Milwaukee, WI 53202
                                            (414) 271-7100 – Telephone
                                            (414) 271-8135 – Facsimile
                                            kravit@kravitlaw.com
                                            lns@kravitlaw.com
                                            sjc@kravitlaw.com